Alright, thank you. You can be seated. Alright, let's hear from the appellant. Good morning, Your Honors, and may it please the Court. Nicholas Anakis for John Watson, Jr. I'm joined at council table by Ken Triccoli. This case is about the forcible medication of John Watson, Jr. Mr. Watson suffers from delusional disorder, a persecutory type. He believes that there is a vast government conspiracy and that he's a member of the British Special Air Service. He's been sick since at least 2009, and the delusions, the symptoms have been present since this case began. We believe the district court erred in two ways in ordering the forcible medication of Mr. Watson. The first way is that the court misunderstood the opinion of the defense expert about the necessity of holistic treatment. Specifically, the combination of medication with supportive cognitive therapy. And I would ask the court to look at Dr. Hilke, the defense expert's second opinion on Joint Appendix 383, where he says any treatment approach, be it pharmacological or psychological, must be combined, or must address, must be offered in a supportive manner designed to mitigate the fears of the individual being treated. Failure to compassionately address these fears only contributes to the fears of persecution. And this is evident in the record as well. After the Chapman order was issued in this case, and Mr. Watson took the medication under threat of contempt, he had exactly those sorts of fears. He had those exact sort of reactions. And we believe that it's substantially unlikely that medication alone will render Mr. Watson competent without supportive cognitive therapy. And this was uncontested below. And we believe the district court clearly erred in misunderstanding the opinion of the defense expert. Well, let me give you a chance at least to address what I take it your opposing counsel will say, which is that Dr. Hilke nowhere said, this isn't going to work. I mean, he said, whatever it is you do, you should do it in a supportive way and things like that. But there's nothing you can point to where he says, look, this isn't going to work. And it's sort of no secret what the factors are. So why didn't he just say that? Your opposition is that he did in that second opinion where he says it must be combined with, must be offered in a supportive manner. And we believe that he expounds upon that right in the opinion just following there, in opinion three, where he says exactly what he means by that. Supportive manner is precisely the tool of supportive cognitive therapy. And we think that that is the direct opposite. You know what, I hate to kind of fly stack the language, but since we're trying to figure out whether and exactly what he said, he says any treatment approach, be it pharmacological or psychological, must be offered in a supportive manner. It doesn't really, I mean, he's assuming that it could be pharmacological, right? Yes, Your Honor. And I think that he agrees that pharmacological treatment is actually necessary, that medication should be provided here, but it has to be offered in the supportive manner, which is the supportive cognitive therapy coming along with it. Then how does it make sense to say that a psychological approach must be offered in a psychological manner? Your Honor, I have to admit, as not a medical expert myself, I'm confused about what a supportive psychological or an unsupportive psychological treatment would be. That's why I struggle with this sentence. It could be a sort of intervention of some sort. I can imagine maybe some sort of psychological treatment which is much more forceful in terms of forcing the individual to confront their fears. For example, in this case, when he expands upon what that supportive therapy talks about, he talks about Socratic questioning to help Mr. Watson understand what position he's in. I can imagine confrontation of saying, you're sick, you're crazy, you need to understand this now, and that would be ineffective. It would be psychological but not supportive. Exactly, exactly, Your Honor. We believe that unless this is combined in a supportive way, medications combined in a supportive way, that Mr. Watson will not be rendered competent here. We believe that that's really the goal in this case is to allow Mr. Watson to become competent to proceed forward. The second error that we attest is that the district court failed to consider the potential not guilty by reason of insanity defense as a special circumstance. As we mentioned a second ago, Mr. Watson's been sick since 2009. His delusions have been present throughout this case. As soon as he was brought into court, there was a joint motion for competency. When he was evaluated six days afterwards, he told Dr. Peterson, exhibited the symptoms of delusion still, and even fit the actual incident into those delusions. The district court erred and failed to consider it a special circumstance by essentially requiring that Mr. Watson go and move forward with a full 4243 hearing, go and have an expert testify about Mr. Watson's insanity at the time of defense, and that's just not possible at this time. And we would say it's not possible really for three reasons. The first is ethical, the second is pragmatic, and the third is legal. The ethical reasons, whether to proceed with a not guilty by reason of insanity defense, whether to plead guilty or not guilty or proceed in that manner, is really a decision solely in the choice of the defendant, whether to proceed in that manner. Also, of course, there's an ethical duty of consultation, and we would say that whether to move forward with a reason of insanity defense, an NGRI defense, has to be in consultation with the defendant for a variety of reasons, not only in terms of potential pleading of guilt or innocence, but also disclosure of confidential medical records as well. So we believe that there's ethical considerations about whether you can go and move forward with a 4243 hearing. But is the judge only saying you have to move forward with the hearing, or just that you would need an expert report in order to make this factor count? I think, Your Honor, I think that... Or is that the same thing? I would say it's close to the same thing, but I think that the second point about whether an expert report would go to the pragmatic concerns, which is that until the defendant is really rendered competent, you can't have a full insanity evaluation. And I would actually point to the Grigsby case, the Sixth Circuit case at page 971. Dr. Lucking, the government expert, was actually the expert in the Grigsby case as well, and he talks about how you can't really definitively determine insanity until the defendant is rendered competent. And so at the moment, until that happens, I'm not really sure an expert could really give a good opinion about whether the defendant was insane at the time of the offense, which leads really to the third issue, which is that it's unclear what the legal standard is and what would need to be offered to show what a special circumstance for insanity at the time. We believe that what needs to be shown would be shown in the Grigsby case, which is essentially that the defendant was insane at the time of the offense. These delusions were persistent. They were there. Were they likely suffering from this mental health disease or defect at the time of the offense? And we believe that's sufficient to show as a special circumstance. And looking at the district court here, the district court did not consider that. The district court instead focused on the speculative aspects and saying that, you know, this is just a potential defense and it is a very high standard to allege this defense, which we agree, it is a high standard, but that does not mitigate the idea that it could still be considered as a special circumstance under the first cell factor. I really want to make sure I understand this because this was my big question about the arguments in this case. I mean, obviously, I think nobody is arguing that the mere possibility that there might be an insanity defense would count as a special factor. I believe the government is arguing that the possibility should not be considered. Should not be, right. But I don't take you to be understanding that the mere possibility is enough to count, or are you? Yes, Your Honor. Any time it's possible that a defendant might raise an insanity defense, that comes in? We think that. Is that going to be almost literally every case involving forced medication? Well, I think that has to be seen in the context of cell itself and in the special circumstances, which is looking at the individual circumstances of the case. And we think that, once again, the standard would be looking at whether delusions were present, whether the defendant is incompetent. That's the standard that we would offer, that the defendant was suffering from that sort of mental health disease or defect at the time of the offense, that those delusions were present. We think that's the standard that we would offer. That's the standard, all right. And we think that would be workable considering the ethical, pragmatic concerns about putting on an insanity defense at this time. And we believe the district court erred in not considering that and saying that given the high standard of a potential insanity defense. And we'd emphasize that, in fact, the evidence is in the record to show that Mr. Watson was, this was a longstanding illness that he was observed shortly after the incident, that he'd been suffering since from 2009. That evidence is in the record already. Which of the medical professionals opined that he was insane at the time of the crime? I'm sorry, Your Honor? Which of the medical professionals opined that? None of them specifically spoke to whether he was insane at the time of the crime. They just spoke to the longstanding nature of the illness. Isn't that what's needed? That in special circumstances we'd have to show he's insane at the time of the crime? No, Your Honor. We don't believe that's actually possible right now to have an expert opine about whether he was insane at the time of the crime. But that's what you just said should be the standard. I'm so confused. I believe that whether he was insane at the time of the crime would have to go to his, there's more of an inquiry there. For example, it's an inquiry of did he believe he was morally justified at the time? Did he understand what he was doing at the time? I believe the 4243 standard has some specific inquiries. Whether he's insane, and maybe the problem here is my terminology, whether he's suffering from a mental health disease or defect. For example, the competency that he's still being incompetent now, still suffering from that mental health disease or defect, whether he was suffering from that at the time of the offense. And would that have to be proven by expert reports? Or does there have to be substantial evidence showing that? What exactly is the district court supposed to ask? I think that they could ask a very similar inquiry to exactly what they asked with competency. They could look at the same sort of expert reports. So you would need an expert report? Yes, Your Honor. We think that to make the determination, of course, whether they were suffering from the mental health disease or defect, and of course the expert would have to comment on, well, was that mental health disease or defect? Render them incompetent now? Was that present? Do you believe that was present probably at the time of the offense? Clashing expert reports? I think that, unfortunately, a lot of these cases do become a battle of the experts, and that's exactly how. So then what would happen? I think that the district court would have to make a factual finding based on the expert's testimony. I think other evidence could be offered as well. Conduct a mini-trial is what you're trying to say, right? No, Your Honor. I don't think this would have to be a mini-trial. For example, in this sort of scenario, you wouldn't have to actually talk about the nature of the offense at all. You could bring in the arresting officers and ask them, well, when you were speaking with the defendant, how did they appear? Were they talking about conspiracies? Were they talking about those sort of things? I wouldn't think that you'd have to get to the nature of the offense at all. I think that you could get that. And in this case, you would survive that inquiry because it's Dr. Peterson who testified that he was. Did one of the experts say that he was suffering from delusions at the time of the crime? Was that Dr. Peterson? Your Honor, Dr. Peterson, after the interview, the competency interview six days later, said that he was suffering at the time. Dr. Hilke, review of the records, has said that he's been suffering since 2009. We don't have an expert specifically saying on that date he was suffering, but we don't believe that's necessary given there's no medical professional on that day who evaluated him on that day. We think that in a lot of cases it could be. Don't they have to at least say he likely was suffering from something during that time period? I think the reports do say that. I think that the combination of when you look at them, when they say he's been suffering since 2009, there's been no testimony that they've ever gone unabated, I think that that evidence is in the record. I think that that is shown. Okay. And we believe that a remand would be appropriate in that manner to go. We don't believe it's necessary, but I don't believe it's been contested that he has ever, since this case began and since the incident, been ever rendered competent at any point, that these delusions have ever not stopped. We'd have to find a clear error, though, wouldn't we? Not on this point, Your Honor. On this point, Your Honor, whether you consider it as a special circumstance, we believe is a legal question that's reviewed de novo. The first question in terms of the necessity of holistic treatment, that is reviewed for clear error. But this, we would argue, is de novo, whether the likelihood of an NGRI defense qualifies as a special circumstance is a legal question. This court looks at it from that standard, from a de novo standard. Can I ask you what will happen if your client is not medicated to stand trial? So what's going to happen next? If the client is not medicated to stand trial, we believe we move on to 4246, where there's a dangerousness hearing, and that would be valid for dangerousness. A civil commitment? Yes, Your Honor. And the government's burden there will be what? Clear and convincing evidence. And the government. I'm asking you, I guess, a little bit to anticipate the government's argument. So the government will say, well, one reason whether or not he's going to plead guilty and maybe even successfully due to insanity, we want to bring him to trial because then we'll have a lighter burden for commitment. Isn't that part of the government's argument? It is, Your Honor. And maybe I'm confused about this argument, but I actually see their burden being lighter on the civil commitment side, saying that you just need to show by clear and convincing that they would be dangerous as opposed to guilty beyond a reasonable doubt in terms of a trial. But I thought even if they lost the trial, am I misunderstanding? I thought even if your client was acquitted on the grounds of insanity. I'm sorry, I realize my time is running out. Yeah, please. If he's acquitted on the grounds of insanity from 4243, then it would be our burden to under clear and convincing to show that he's not dangerous. So isn't that part of the government's argument for why they have a sort of full interest in going forward so that they can get that? Yes, Your Honor. We would argue that that shifting burden is not an appropriate consideration under cell. Cell specifically refers to potential for future confinement, and we don't believe the shifting burden there is an appropriate consideration under that cell factor. Can I ask one more question? Do you have any, if this went forward under 4246, what do you think would happen? Can you give any, I guess maybe I'm asking, can you give any assurances that this person will be committed? I mean, isn't this something that the government can look at, that there's a real concern that a dangerous person who's shooting at helicopters is going to be back out on the streets if they don't go forward with the trial? Absolutely, and Your Honor, I believe the government may be able to speak better to that. I believe my obligations to Mr. Watts would be to ask that they may not be confined. So I don't believe I can speak to that point right now. Thank you, Your Honor. Thank you. Ms. Martinez. Good morning, Your Honors, and may it please the Court. My name is Julia Martinez. I'm an AUSA in the Eastern District of Virginia in Alexandria, here representing the United States. I'll start with your question, Judge Harris, on whether a civil commit proceeding would be pursued, whether it would be successful. Of course, it's very difficult to predict those sort of things, but there is one thing on the record that the Court could look at that speaks to that, and that is Dr. Lucking's initial report. And I will tell you that in Joint Appendix, page 360, in that report, Dr. Lucking discusses whether or not this defendant meets the requirements, the criteria in Washington v. Harper, and he discusses the fact that in his opinion, at least at that time, and of course circumstances could change, but at the time that Dr. Lucking is issuing his report, that this defendant does not meet that criteria, precisely because he is not an imminent risk for danger to himself or to others. And so, Your Honor, although circumstances may change and we can't possibly predict the future, on the record, at the time of Dr. Lucking's report, the only thing that we have to say whether he could be committed if we don't proceed with this case criminally, is Dr. Lucking's opinion that at that point of time, in those circumstances, he was not actually a danger. That would, of course, if that remained to be true in a civil commitment hearing, that would make it very difficult, if not impossible, to commit. I guess on the plus side, it would mean he's not a danger, so that would be fine. Absolutely. And I believe that in the testimony of Dr. Lucking, and I was trying to pull up the JA's site during counsel's argument, and I didn't quite get it, but during the testimony of Dr. Lucking, there was a little bit of expansion on that issue. And Dr. Lucking was asked, for example, whether that opinion was limited to the present circumstances, which, of course, were within the confinement at Butner, and he stated that he would have to reevaluate if the question was whether he'd be released to society. But there's no sort of further expanding on the record on that issue. So, of course, the government would argue that someone who is mentally ill with a firearm and a convicted felon, we would certainly argue that there's dangerousness there, of course. But on Your Honor's question of how likely the civil commitment proceeding is, I'd simply point to that issue. Is the cell test satisfied by testimony from a doctor alone that a particular course of treatment is substantially likely to render that patient competent? Is that enough? On the testimony of that doctor? Yes. On the testimony and a report, yes, I believe that that is enough, Your Honor. I believe that's what the district . . . And you don't need any other evidence in it? Beyond the report and the testimony of the doctor? I don't think that you necessarily do, and I don't think in this case there was any sort of requirement for additional evidence. I'm sure there are cases in which there may need to be additional evidence. When something is challenged, for example, by the defense, perhaps there needs to be additional development on the record. In this case, all parties agree that the medication is necessary. Defense has conceded that and hasn't contested that before this court, and both of the experts that spoke to medication with respect to this defendant both agreed, both the government expert and the defense expert, that medication is necessary in this case. The core dispute here, the only dispute here, is whether Dr. Lucking's treatment plan will be substantially likely to render the defendant competent. But there's very little in the record on the particular type of disorder, the delusional disorder. I mean, he's got his statement there, and that's kind of where we are. And the cell test enumerates factors to be considered here and how we go about doing it. And I'm just wondering, what does that mean? The doctor comes in and says, oh, it would be substantially likely to make him competent. So we then just can inject it. Well, Your Honor, I would submit that in Dr. Lucking's report and his testimony, he actually goes into great depth about the nature of that illness. He does mention that it is a rare illness, and that perhaps informs Your Honor's concern that there's not additional information on that. But he discusses how it presents, how it affects patients who are suffering from this delusion, adding the fact that often they can function normally in society until something really interferes with that persistent delusion that they have. Dr. Lucking himself has treated, I think the way he testifies, is more than ten patients suffering from delusional disorder, and he treated them all successfully with psychotropic medication. He also cites to a number of studies. He does cite to the Harris study, which this Court may be familiar with from previous opinions addressing the Harris study. But he actually goes on and addresses a number of studies. What's the evidence to show that the treatment would work on this defendant? The evidence that Dr. Lucking presents, the evidence that the Court relied on, is Dr. Lucking's experience in treating patients with this type of disorder and treating them particularly with medication. The studies that he relies on in looking at treating this type of disease, this type of disorder, with medication. All he needed was a diagnosis. He didn't actually have to see him or even evaluate him. He simply could say, oh, I know the diagnosis. I can fix this. I can make him confident by simply medicating him. Hypothetically, Your Honor, perhaps, but that's not the facts of this case. He did treat him. He did interact with him. He did have sessions with him. His diagnosis is not based on someone else's diagnosis. Dr. Lucking sat down face-to-face with this defendant. What does substantially likely mean? What does substantially likely mean? Is that more than 50%? What does that mean in the context of someone who will be competent? What does he mean by substantially likely? He didn't say to a reasonable degree of medical certainty. He didn't say to probabilities. He said substantially likely. What does that mean? Well, he used the terminology in the Sell opinion, and I think that that was appropriate. And I think this Court can look at Sell and can look at ñ Well, he's not a lawyer. He's using the terminologies there. I want to know what he meant by it. Well, all we can do is look at the record, and we can base his substantially likely in part on the fact that in every case that he has treated a patient with delusional disorder with psychotropic medication, it has been successful. How many of those patients were subject to forced medication? I'm sorry? How many of the patients he treated were subject to forced medication? I believe, if I'm not wrong, if I'm not incorrect, Your Honor, that all of his cases were involuntary medication cases. They were all involuntary, okay. I believe that's right. I would want to double-check the record to be sure. At least some of them. I just couldn't remember. I think it might have been ñ certainly some of them. I think it might have actually been all of them. So, on that substantial likely, we haven't articulated any percentage, but circuits have laid out percentages in terms of what would constitute such a thing. Well, Your Honor, I would submit that based on the record that we have here and the way that Dr. Lucking testified, no one asked him about a percentage. He didn't testify to a percentage. But he testified that in his experience, in all of his cases, it has been successful. And he cited a number of studies about the success of medication. Well, I mean, no one asked him means the evidence wasn't put forth. It doesn't mean ñ it's almost like the magistrate and district court sort of took the defendant's expert and said, well, you didn't say it won't work and made something out of that. That's kind of interesting in the sense of if you don't say it doesn't work, that must mean it worked. But if there is a percentage in some circuits as high as 70 percent that would have to establish substantial likely, because what we're talking about is making someone take a medication, and we're going through these factors here. And just to have a doctor walk in and say substantially likely, who knows what he means? It could be 30 percent for him. That could be substantially likely. That's a pretty high. If you felt like you could catch the flu 30 percent of the time, that's a good ñ I'd probably call that substantially likely. I don't know what he meant, and I'm trying to determine, at least in terms of the evidentiary proof that's necessary, wouldn't that be something that we would want at least have articulated when we're talking about making someone take a medication that he says is going to make them competent to stand trial? Your Honor, I have a couple thoughts on that. And the first is, and I may be repeating myself, but I think that based on the testimony as a whole and his report as a whole, this court can fairly comfortably conclude that he did not mean 30 percent was substantially likely. But perhaps more importantly, Your Honor, and with all ñ That's a nice way of putting it, and I understand you can repeat it, but sometimes repeating does help, particularly for people like me to understand it. But I don't quite get that one, that the report as a whole, that sort of fits in the category of totality of circumstance. We use it all the time. But totality can be no greater than what those parts are there. I mean, you've got to tell me something in there that tells me it gets it over. I didn't say 30, I was just using an example, but you'd feel like at least it was 50 percent, half of the time it's going to work or something. What is there to indicate what he meant by substantially likely? The fact that Dr. Lucking's own success rate is 100 percent. I think that that is something that this court can look at to mean that when he says substantially likely and he says my success rate is 100 percent, he means something that's ñ He could have treated 100 percent of the folks who he might have misdiagnosed. For all I know, I don't know about the other patients. He could have had 50 patients and gave them this medication, and that wasn't really what did it. It was the fact that they were no longer outside or whatever. I don't know. I don't want to go into analyzing how his previous work. I'm interested in this patient, and you said he treated him. So in treating him, there should be some medical diagnosis that reflects what he means by substantially likely. Your Honor, there is not a point in the record that I can point to where he says a percentage or he further explains substantially likely. Do we need that? It's just not there. It's not a big deal, I guess, and we could always send it back to ask. To delve into that aspect of it, we're talking about a right that a person has not to have things injected into them. Couldn't we just send it back and pull that information out? Respectfully, Your Honor, and that was actually going to be my second point, is that question's not before the court. The only thing that the defendant has raised is whether the district court erred in their interpretation of the second expert of Dr. Hilke's report, and that whether their interpretation of Dr. Hilke's report, whether district court's interpretation was incorrect, and that the district court should have concluded instead. But the overall question is whether he should be medicated, and do we not have to analyze the cell factors to get there? Your Honor, I would submit that. Two of the cell factors are implicated, Your Honor. I agree that two are implicated. Is it substantially likely one of those factors to be considered? The factor is implicated, but so is the first factor, which is that the government has an important interest, and, of course, the defense has conceded, as it well should, that the government does have an important interest. So I don't think it's fair to say that both of the first two factors. That alone establishes that you find the first factor and we just, that's it? Well, no, Your Honor. The first factor really has two prongs. One is the importance of the government's interest, and the second is the special circumstances. So I use that to illustrate only that it's not really correct to say that both of the first two factors are before this court. Your Honor, can I suggest that, for me, it does seem like these two different questions under factor two, what you do with the Hilke report and what you do with the Lucking report, actually are related, that one of the reasons we might want more clarity out of the Lucking report is because however you read the Hilke report, I think it is fair to say it raises questions about this course of treatment. Like maybe it didn't say the right words, and I'm really not trying to prejudge that. The district court's reading of that report may not have been clearly erroneous, but even if it was, it does seem that it raises very serious questions about whether going forward this forcible medication is going to be effective, or whether it's going to maybe sort of be effective, but also increase paranoia to a very sort of significant degree. I mean, there are a lot of questions raised, and in light of that, it does seem to me that they are related issues. You might want a little more in the way of specificity out of Dr. Lucking. Well, let me point, Your Honor, perhaps in responding to that, to sort of the procedural history of this case, and particularly with respect to Dr. Hilke's report. Defense counsel has focused entirely on Dr. Hilke's recommendation for holistic treatment, but holistic treatment was never part of the record below until Dr. Hilke's report. And I'll note that we had had two evidentiary hearings, multiple rounds of briefing, multiple rounds of argument. Dr. Lucking testified at both of these evidentiary hearings. These are hearings where both sides had an opportunity to call witnesses. Defense actually called the defendant at the first cell hearing. All of this had happened prior to the Hilke report. After the both hearings, after the magistrate judge had orally from the bench issued an opinion, after defense counsel had objected to the magistrate judge's jurisdiction, after the district court judge took jurisdiction and remanded back down to the magistrate court to write a written report and recommendation, it was only then that defense counsel asked for leave to obtain an expert and then filed supplemental briefing with the Dr. Hilke report. Defense counsel never asked for additional hearing, never asked to have Dr. Hilke testify. Holistic treatment was never an issue. And that's precisely because cell is about involuntary medication. There's nothing on the record to suggest that the defendant would resist holistic treatment whatever we interpret that to be, and there's nothing on the record to suggest that any sort of treatment beyond medication might not be offered down at Butner. This was simply never raised by the defendant until the very 11th hour. And then the district court, and rightfully so, and the magistrate court in its report and recommendation, viewed the Hilke report in the context of the record as a whole, both evidentiary hearings, the other two experts, Dr. Lucking's testimony, his report, all of the briefing by parties, and determined that Dr. Hilke's report standing alone simply did not undermine his confidence in Dr. Lucking's conclusions, which he based both on the report and on Dr. Lucking's testimony, which, of course, was opened to cross-examination by defense counsel, and then they cross-examined him at quite length. Holistic treatment is this sort of thing that was raised at the very last minute as a, well, even though everything else on the record is strongly pointing in favor of all of these factors, maybe there's this. And the district court gave fair weight to that report. Without the benefit of testimony, defense counsel never asked for another hearing, never called Dr. Hilke to testify, but read what was on paper, and I would submit to you that the district court's interpretation of what's on paper is simply not clear air, and that the district court's interpretation of Dr. Hilke's opinions, as well as the record as a whole, is not clear air. And that is the standard here, whether the district court clearly erred in determining that forcible medication would be substantially likely in rendering the defendant competent. And I respectfully submit to you, Your Honors, that there really is nothing on the record to suggest clear air. That's a high standard. I'm running short on time, and I don't want to neglect the defense counsel's other argument. I don't know if Your Honors have any questions about that. But I guess what I would say about that is the following. The question there is really all we have on the record is that the defendant was suffering from a delusion around the time of the offense. That's all we have in order to support this idea that he may have a possible insanity defense and that that might be possibly successful and that that should somehow undermine the first factor as a special circumstance. Your Honors, I'd submit that you don't need to reach the question, which the Fourth Circuit has not yet reached, about whether it could ever be a special circumstance. I'd argue that you don't need to reach that question simply because in this case, there is very little on the record to give us any sort of confidence that that possible insanity defense would be likely to be successful. So one thing that concerns me here is that it doesn't seem as though the district court judge did what you just did and looked at the whole record and said, looking at this record, I just don't see any substantial basis for an insanity defense. As I read it, at least, the district court said there's no expert testimony that he was legally insane and that's the end of it. And those, to me, seem like very, very different standards. And I'm concerned that this idea that there needs to be expert testimony going directly to insanity is a pretty high standard. I can't see what case it's coming out of. I just don't really know where that came from. Well, I think actually where it came from, Your Honor, was another Eastern District of Virginia case. The Duncan case. But Duncan never said that was a requirement. It said we have that here, and that's enough. But nothing in Duncan says, and that is a, you know, it is not only sufficient, but it's also necessary. I agree, Your Honor. And I don't think the district court said that that was necessary. The holding of the district court was that the mere possibility of an insanity defense is not a special circumstance that substantially outweighs the important government interest. Right. And I, like, a mere possibility, I think everybody, well, I agree, a mere possibility, it's going to be there in every case. That can't be enough. But then, I mean, all he says is that none of the three experts in this case has expressed that defendant was unable to appreciate the wrongfulness of his actions on the date of the charged conduct. Period. That's it. Therefore, nothing. And so that is my concern. I don't see what you just talked about, which is sort of a real kind of focused review of the record as a whole to see if whatever the standard is, there's maybe a substantial potential insanity defense or substantially likely to succeed or wherever you want to put that bar. The only thing the district court considered was whether there was expert testimony. Well, Your Honor, I actually would point you to Joint Appendix page 321. That's the magistrate court's report and recommendation, which is actually adopted by the district court order. So I think the court has to look at both as a whole. I mean, I guess so. But my concern is if we were just to affirm this decision, it would really look like we are saying from now on the rule is you need an expert testifying to legal insanity. It's not enough to have an expert saying he was under the influence of this delusion at the time the crime was committed. Assuming we have that here, you don't need to address that part. I respectfully disagree with that. I think if you affirm the order, I think that the holding of the district court is that the mere possibility is not enough. And that in this case, we only have a mere possibility. But, again, if you look at pages 19 through 20 of the magistrate judge's report and recommendation, the magistrate judge, and keep in mind this is the judge who actually presided over the evidentiary hearings, he actually goes into depth about the defendant's argument and about what we have on the record that goes towards. But a big part of the magistrate judge's reasoning, right, is actually rejected by the district court. So it's very confusing because the magistrate relies heavily on this idea that because he thought he had immunity, diplomatic immunity, that showed he knew the difference between right and wrong. And the district court says that's not right. So I don't think we can just assume that, you know, there's kind of a one-to-one correspondence between these two opinions. Well, the district court says that it may be or may not be. Right, but obviously the district court is not adopting as a whole the magistrate's report here. Although I would say that in the actual district court order, it says that it adopts the report recommendation and its findings as its own. I guess the fair way to read that would be unless I say so otherwise in the next couple pages. So I think that absent having said something explicit like I respectfully disagree with the magistrate judge on this particular point, I actually do think that the order fairly encompasses the entirety of the 27-page reporting recommendation. I see that I'm out of time unless anyone has any further questions. Thank you very much. Thank you. Reply. Your Honor, just a few brief points. Beginning with Judge Wynne's line of questioning about substantial likelihood, I would emphasize that all of the doctors in this case, both Dr. Hilke and Dr. Lucking, talk about how this is an incredibly rare disorder. And, in fact, at the conclusion of the first cell hearing, Dr. Lucking was specifically asked to talk about these patients that he's previously treated in hopes of finding to see whether they were similar to Mr. Watson. And Dr. Lucking did not answer that question. I think, moreover, What does that mean? What percentage should be attached to that? Your Honor, I think that it has to be an incredibly high numerical value. I think that this Court has been very clear about forceful medication and the serious Fifth Amendment rights that are implicated there. I think substantially likely. We're talking about administering drugs that could potentially alter someone's neurochemistry forever. I mean, I would hope that we're talking, you know, I would ask for 100 percent, but, of course, absolute certainty isn't, you know, it's as likely, not certain, but I would think that this would need to be incredibly high. You know, this is something that could affect Mr. Watson for the rest of his life. And I think the substantial likelihood factor is even more in play here, given we can see the results of the medication alone and we could see Mr. Watson's reactions based on his testimony during the cell hearing about feeling these fears of persecution. He's afraid, and Dr. Hilkey's report talks about he's afraid of the medication, and he has these adverse effects. I would argue, and this goes to your point, Judge Harris, we do believe the clear error standard is implicated in understanding the government's burden on this point. We believe the District Court erred in misunderstanding precisely what Dr. Hilkey was saying and therefore not addressing these concerns about paranoia and how that might affect Mr. Watson. We think that really does go to the entire factor. It was framed as the District Court erring and not addressing holistic treatment, but that really is what it goes to, and that's why it's important that the District Court address it, and we don't believe the government met their burden on that issue. As for the NGRI issue, I just want to, in case I wasn't clear before, I wanted to say once again that we would agree that, of course, the possibility of an NGRI defense in any case wouldn't meet this standard, but it would absolutely have to be based on a factual inquiry showing a mental health disease or defect during the period of the alleged incident. If the Court has no further questions, we would ask to remand this case for further proceedings. Thank you very much. I'll ask the Clerk to adjourn the Court.
judges: William B. Traxler, Jr., James A. Wynn, Jr., Pamela A. Harris